IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

BILLY DAVID MULKEY,

                    Petitioner,

      vs.

JENNIFER BARRETTO, Acting Warden,
California Health Care Facility,[1]

            Respondent.

No. 2:14-cv-00407-JKS

MEMORANDUM DECISION

Billy David Mulkey, a state prisoner proceeding *pro se*, filed a Petition for a Writ of Habeas Corpus with this Court pursuant to 28 U.S.C. § 2254. Mulkey is in the custody of the California Department of Corrections and incarcerated at the California Health Care Facility in Stockton. Respondent has answered, and Mulkey has not replied.

I. BACKGROUND/PRIOR PROCEEDINGS

On December 18, 2008, Mulkey was charged with second-degree murder (count 1) and three counts of assault with a firearm (counts 2-4). The information further alleged as to count 1 that Mulkey intentionally and personally discharged a firearm causing great bodily injury. Mulkey pled not guilty to all counts, denied the allegations, and proceeded to a jury trial. On direct appeal of his conviction, the California Court of Appeal laid out the following facts underlying this case:

---

[1]    Jennifer Barretto, Acting Warden, California Health Care Facility, Stockton, is substituted for Joe A. Lizarraga, Warden, Mule Creek State Prison. FED. R. CIV. P. 25(c).

# I. Trial

## A. Prosecution's Case–In–Chief

### 1. The shooting

On June 22, 2008, the victim and his wife Rosales Hendricks were at their residence on Wild Rose Way in Yuba County. Mrs. Hendricks's mother, Wanda Tallen, lived one block away on Wild Rose Way. [Mulkey] lived next to Tallen. With the Hendricks's permission, several individuals lived in a trailer on the Hendricks's property, including Everett Hawkins, Ashley Hays, Amanda Cavagnaro, and Brian Maudlin.

The victim was five feet eight inches tall and weighed approximately 160 pounds. He had a "crippling" bone disease, walked "bent over" with a swing in his hip, and had an arthritic hand. The victim had previously sustained a gunshot wound to his right hand necessitating surgical reconstruction.

On the evening of June 22, 2008, around 6:00 to 7:00 p.m., Mrs. Hendricks received a telephone call from Tallen, who complained that [Mulkey's] dogs had gotten loose and attacked Tallen's dogs. The victim, dressed only in silk boxer shorts and wearing sandals, drove to his mother-in-law's house to assess the situation. After visiting Tallen, the victim drove toward [Mulkey's] property by himself. According to Mrs. Hendricks, the victim was upset. Indeed, this was not the first time the victim had discussed [Mulkey's] dogs with [Mulkey].

Ten to 15 minutes after the victim left, Mrs. Hendricks heard two gunshots. Hawkins, Hays, Cavagnaro, and Maudlin also heard two gunshots. The second shot occurred within seconds of the first.

Before the gunshots, Maudlin heard the victim screaming at [Mulkey] about the dogs, saying "your fucking dogs are chewing my dogs up back up on grandma's property again. You need to keep your dogs on a leash or p[e]nned up."[FN2] Preceding the gunshots, Hays heard both the victim and [Mulkey] yelling.

FN2.   Everyone referred to Tallen as "grandma."

Following the two gunshots, Hawkins, Hays, Cavagnaro, and Maudlin spotted the victim's truck heading away from [Mulkey's] property, and they watched as the truck briskly passed the trailer on the Hendricks's property. The victim was not known to drive fast on that road (which was rocky and heavily rutted), so the rapid pace of the truck was unusual. The driver had something like a towel covering his face but based on his hair, the witnesses could tell that the driver was not the victim.

After the truck passed by the trailer, instead of going toward the Hendricks's homestead, the truck turned the other direction and was later heard crashing into a rock. When Hawkins and Maudlin reached the truck, it was still running and nobody was inside. Hawkins heard somebody running through the bushes and Maudlin heard a similar noise.

Concerned about the gunshots, Hawkins, Maudlin, and Cavagnaro drove to [Mulkey's] house. When they arrived at [Mulkey's] property, they found [Mulkey]

standing on his property holding a shotgun.  They mentioned the gunshots and inquired "over and over" about the victim, but [Mulkey] did not respond.  [Mulkey] looked up, stared off into space and uttered something about trying to be a good neighbor, or never wanting problems with his neighbors, or people "always starting—."  What [Mulkey] said was jumbled and difficult to understand.  [Mulkey] ejected two shells from his gun, one of which was spent.  Hawkins handed the spent shell to [Mulkey] and kicked the other shell into the bushes.  Cavagnaro tried to step around [Mulkey] with her flashlight to look for the victim, but [Mulkey] pointed the shotgun at the trio and told them to get off his property.  Hawkins thought the shotgun was not loaded.  Nevertheless, they left [Mulkey's] property and went to the Hendricks residence, after which law enforcement was contacted.

**2. The sheriff's investigation and [Mulkey's] statements**

Deputies from the Yuba County Sheriff's Department, including Kai Jahnsen and William High, were dispatched to the scene at approximately 9:30 p.m. that night.  The deputies met [Mulkey] at the entrance to his property.  [Mulkey] appeared nervous and sweaty.

The deputies informed [Mulkey] that they had received information that a neighbor had come to talk to him about a problem with dogs, shots were fired and the neighbor never returned.  [Mulkey] stated that his neighbor had left.  The deputies indicated that they wanted to make sure he was not on the property and not injured.  [Mulkey] reluctantly allowed the deputies on his property.

Deputy High discovered a shotgun shell on the ground and picked it up.  Deputies Jahnsen and High also observed what appeared to be a puddle of blood on the ground that was still moist and partially dried.  [Mulkey] claimed that the puddle came from a dog he had killed a few days earlier.  When the deputies inquired as to the location of the carcass, [Mulkey] stated that he had burned it and showed the deputies the burn pile where the conflagration supposedly occurred.  The deputies did not find any carcass or animal bones there.  When the deputies inquired as to the gunshots heard earlier that evening, [Mulkey] stated that he had fired a few rounds to bring the dogs back home.

Detectives were called to [Mulkey's] property.  Sergeant Million, the lead investigator, responded to the scene somewhere around midnight or the early hours of the morning on June 23 and spoke with Deputies High and Jahnsen.  Deputy Jahnsen drove [Mulkey] to the Brownsville substation and Sergeant Million followed.

At the substation, Sergeant Million interviewed [Mulkey] for five to six hours with breaks in between.  During the interview, [Mulkey] repeatedly denied shooting the victim.  [Mulkey] explained that the victim drove to [Mulkey's] property and a dispute ensued over the dogs.  At one point, [Mulkey's] dogs were running behind the victim.  [Mulkey] feared the dogs were gathering in a pack formation, so [Mulkey] shot twice over the top of the dogs to scare them back to their pen.  Everything calmed down, the victim drove off and [Mulkey] did not see him again.  At some point thereafter, some people who were yelling and screaming approached [Mulkey].  [Mulkey] unloaded his shotgun in front of them and told them to leave.  Million raised the possibility of [Mulkey] shooting the victim accidentally, when attempting to scare off the dogs, or in

self defense, but [Mulkey] persistently denied shooting the victim.  [Mulkey] mentioned that the victim had threatened him before, had threatened him on the night of the shooting, and had threatened to shoot him in the past.  [Mulkey] further indicated that everyone in the area carries a gun because of mountain lions, and that the victim usually carried a gun.  According to Sergeant Million, [Mulkey] seemed "startled and dazed" and was animated at times during the interview.  [Mulkey] commented that things seemed gray in his mind and were in a blur, and he explained that his brain had been damaged by Depakote and Lithium.  Nevertheless, on multiple occasions during the interview, [Mulkey] "adamantly" denied that he had shot the victim.  After the interview, [Mulkey] was transported to the main sheriff's office in Marysville.

Meanwhile, at [Mulkey's] residence, Deputy Brett Felion conducted a crime scene investigation in the early hours of June 23.  The deputies had obtained a search warrant to search [Mulkey's] property.  During the search, Deputy Felion found the victim's body in a wheelbarrow, covered by a tarp that was held in place by a tire.  The body was located approximately 111 feet from the blood pool the deputies had discovered earlier.  The deputies discovered a pistol grip shotgun lying on the seat of a Ford F250 located on [Mulkey's] property, not far from the victim's body.

At approximately 9:50 a.m. on June 23, Detective Michael Williamson interviewed [Mulkey] at the sheriff's office.  [Mulkey] had told another detective that he wanted to speak to somebody, so Detective Williamson met with him.  [Mulkey] informed Detective Williamson that he killed "Keith" (the victim) and that he was "just beginning to remember."  [Mulkey] explained that the victim drove up to [Mulkey's] property and approached [Mulkey].  The victim was angry and yelling about [Mulkey's] dogs getting loose.  [Mulkey] was carrying a 30/30 rifle that he always carried when he walked around his property.  [Mulkey] stated that he was shocked and scared by the victim's approach.  The two exchanged words and, at some point, the victim pushed [Mulkey] and began slapping at him.  [Mulkey] conceded that he shot the victim, causing the victim to fall onto the ground.  [Mulkey] stated that he fired twice, but he could not remember the details of the second shot.  [Mulkey] acknowledged that the victim did not have a gun, knife or any other weapon.  Upon seeing the victim on the ground, [Mulkey] could see the gunshot wound to the chest.  [Mulkey] attempted to stop the bleeding, but it was too severe and the victim died.  [Mulkey] explained that he put the body in a wheelbarrow and moved it, and that the body was still hidden in the wheelbarrow under a tarp near a trailer at the end of his driveway.  Detective Williamson discussed the possibility that [Mulkey] had been driving the victim's truck and the accounts of witnesses who observed a person driving the truck with a rag covering his or her face.  [Mulkey] did not recall driving the victim's truck, but acknowledged that he used paper towels to wipe his face and that is possibly what the witnesses had observed.

Later in the afternoon of June 23, Sergeant Million visited with [Mulkey] in a holding cell.  Million asked [Mulkey] where the rifle was and [Mulkey] told Million where he had placed it.  Based on [Mulkey's] directions, the deputies at the scene found the 30/30 lever-action rifle concealed in the brush on [Mulkey's] property.  The rifle had been wedged in the brush some 15 to 30 feet off the trail as if to hide it.

-4-

On the morning of June 24, Sergeant Million spoke with [Mulkey] about his admission to detective Williamson that he shot the victim.  [Mulkey] stated that the victim had approached him, the victim swung on him, and because [Mulkey] felt he had no choice, he shot the victim.

Later on June 24, Detective Williamson relayed information from the victim's autopsy to Sergeant Million.  Sergeant Million spoke with [Mulkey] again, hoping to clarify how the victim received his gunshot wounds.  [Mulkey] told Million that the victim had approached him in an angry manner.  [Mulkey] verbally described what occurred and physically demonstrated as he spoke.  [Mulkey] was holding a dog in his left hand and he had his lever-action rifle in his right hand down at his side.  The victim slapped the dog out of [Mulkey's] hand and then swung at [Mulkey] with his right fist.  As the punch followed through and missed, [Mulkey] stepped back, grabbed his rifle with both hands and, from his hip, fired a shot at the victim.  As [Mulkey] was falling back, he worked the lever action at hip level and fired a second shot.  Initially, [Mulkey] said the victim had fallen onto his back when the second shot was fired.  The autopsy information indicated that one shot entered the front portion of the victim's torso and another shot entered the back of victim's torso, so Million pointed out that what [Mulkey] described could not have happened.  He asked [Mulkey] if he shot the victim in the back while the victim lay on the ground.  [Mulkey] stated that he would never do that, and then explained that the first shot spun the victim around and then [Mulkey] shot the victim in the back and the victim landed face-first on the ground.  [Mulkey] then rolled the victim onto his back, noticed that he had multiple wounds, and stated "why did you do that[?]"

[Mulkey] stated that his wife was inside a building on the property, and she came out at one point.  [Mulkey] told her everything was okay and to go back inside.  [Mulkey] did not recall driving the victim's truck and crashing it, but he affirmatively stated that his wife did not drive the truck.  [Mulkey] tried to put the victim's body in the truck, but he could not lift the body inside.  Eventually [Mulkey] put the victim in a wheelbarrow, pushed him a distance, and placed a tarp over the victim.  [Mulkey] recalled people confronting him after the shooting and inquiring about the victim's whereabouts.  [Mulkey] unloaded his shotgun in front of them because he did not want to shoot them or harm them.

According to Sergeant Million, [Mulkey] appeared to be more rested and had more memory of the incident on June 24 as compared to [Mulkey's] previous interaction with Sergeant Million on June 23. Sergeant Million acknowledged that [Mulkey] told him during the interview on June 24 that he believed he had no choice and did not mean to shoot, that he never planned to shoot, that the shooting just happened under the circumstances, and [Mulkey] described the shooting as "the gun went off."

**3. The rifle**

Sergeant Million testified that a 30/30 lever-action rifle does not chamber a round automatically after being fired.  Instead, the shooter must manually move the lever action to chamber another round of ammunition.  He testified that it is preferable to carry this weapon with the hammer half-cocked because that position is a safety mechanism.  The rifle will not accidentally discharge by touching the trigger or dropping it when the hammer is in the half-cocked position.

**4. The autopsy**

The autopsy revealed two gunshots to the torso.  One bullet entered the victim's upper left chest and traveled from left to right, penetrating the right side of his heart and the right lung, exited just below his right armpit, and reentered the right arm.  Bullet fragments were recovered from the right arm.  The path of this bullet was very slightly upward, maybe five degrees at the most.

The other bullet entered through the upper back, about three quarters of an inch to the right of the spine, penetrated the left lung, exited the chest, reentered through the top of the left armpit, and exited the outside surface of the upper left arm.  This bullet traveled more steeply upward relative to the body than the chest wound.  Either shot individually was fatal.

Based on the assumption that the shot to the left chest was first, the pathologist opined that the victim had been turned away from the shooter when that shot was fired, resulting in the left-to-right trajectory.  "The shot [to the back] would follow if [the victim] continued to turn and wound up completely turned around with a second shot falling to his back with him also collapsing away from the direction of the shooter, causing the bullet to pass at a more upward angle as it went through his body."

Based on the location of the exit and reentry wound in the armpit, the forensic pathologist opined that the victim's right arm would have been down at his side when the chest wound was inflicted, but he could not give an opinion about the position of the left arm.  However, the left arm would have been down at the victim's side when the gunshot wound to the back was inflicted based on the location of the exit and reentry wound in the armpit, and because the victim's right arm was broken, that arm probably also would have been down when the victim was shot in the back.

Based on the stippling on the skin around both entry wounds, the forensic pathologist estimated that the shots were fired from approximately three to three and a half feet away.  Had the muzzle been closer, there would have been more stippling around the entry wounds and the pattern of stippling would have been smaller.  Also, at six to eight inches, gunpowder soot would be present.

**B. Defense Case**

**1. Testimony of Phillip Routan**

Phillip Routan had known [Mulkey] for 15 years and had met the victim probably eight to 15 times.  Routan did not recall that the victim walked with a limp and he did not notice anything significant about the way the victim walked.  On a single occasion about

a year before the shooting, Routan observed the victim carrying a holstered pistol on [Mulkey's] property.  Routan asked the victim about the pistol and the victim pulled it out and uttered some offensive term, but he did not threaten anyone with the gun.  Routan did not know why [Mulkey] discharged his firearm at the victim, but if Routan were there at the time, he would have assumed the victim was armed and "it would have put [Mulkey] in a heightened state of being."

At approximately 10:00 p.m. on the night of the shooting, [Mulkey] called Routan and told him to drop everything, "get up to the mountain," and get [Mulkey's] wife out of there—it was an emergency.  Although Routan asked [Mulkey] what was wrong, [Mulkey] did not elaborate and instead just said, "[G]et up here.  It's an emergency.  Get up here now."  Routan set out for [Mulkey's] property but was eventually stopped by deputies on the scene.

## 2. [Mulkey's] testimony

[Mulkey] testified that he and the victim were longtime friends, "like family."  They had an inconsistent relationship but "kept a peaceful rapport."  Despite a hand operation, the victim had a good handshake and could handle a pistol.  Within a month prior to the shooting, [Mulkey] had seen the victim "run like a gazelle."

[Mulkey] owned and kept guns on his property, which he referred to as "mountain lion country."  [Mulkey] is a "Black Powder enthusiast" and has "been invited to join" such clubs as the "Sierra Muzzle Loaders."  He indicated he had received firearm training in the Coast Guard, where he served for four years.

[Mulkey] had previously observed the victim with a revolver and a rifle.  The victim had a gun almost every time [Mulkey] saw the victim.

On one occasion, the victim stuck a rifle in [Mulkey's] face when [Mulkey] was trying to move some items on a pallet down the road.  The victim's eyes were dilated and he looked wild.  The victim's attitude changed when [Mulkey] stated he was glad to see the victim.

Occasionally [Mulkey] would visit the Hendricks residence whereupon [Mulkey] would be informed by Mrs. Hendricks that the victim was "off the hook," meaning that he was very angry.  [Mulkey] would "have a smoke" with the victim and "calm him down."  [Mulkey] "finally surmised" that the victim's anger spurts stemmed from the fact that he was "out of drugs," specifically methamphetamine.  A mutual neighbor had informed [Mulkey] that the victim and others "were doing crank."  One time [Mulkey] thought he saw methamphetamine crystals on a serving tray in the victim's room.

Earlier on the day of the shooting, the victim visited [Mulkey's] property while defendant was working on a dog pen.  The victim stated that [Mulkey's] dogs had attacked one of Tallen's dogs and that [Mulkey] needed to apologize to her.  Both the victim and [Mulkey] were concerned about the dog situation.

Subsequently, [Mulkey] visited Tallen's house with his wife to make peace.  After [Mulkey] examined the injured dog, [Mulkey] concluded that the dog had been injured by cable or wire.  Tallen was glad to see [Mulkey] and when [Mulkey] left Tallen's residence, everything was fine.

[Mulkey] then visited the Hendricks residence to inform the victim that he had made peace with Tallen.  [Mulkey] tried to explain that his dogs had not harmed Tallen's dog.  The victim stated that he "didn't give a damn or something" and if [Mulkey's] "dogs come over on the property anymore, he would shoot them."  [Mulkey] responded that if the dogs went onto the victim's property and the victim shot them, "there is nothing I can do."  [Mulkey] then "turned around and left in peace," but the victim had a "threatening attitude."

When [Mulkey] returned home, he noticed that two of his dogs had escaped from the pen, and he went looking for them in the woods.  He carried his rifle because "the mountain lion was around" and his dogs typically yielded when signaled by his rifle.  When [Mulkey's] wife screamed "Billy," he returned and noticed that the victim was on [Mulkey's] driveway wearing only silk-looking boxer shorts.  [Mulkey] was troubled by the victim's yelling.

[Mulkey] had his dog "Scout" in his arm.  He put the dog down and placed his 30/30 rifle in his left hand.  [Mulkey] said "peace, brother" to the victim.  The victim was standing with the sun directly behind him.  [Mulkey] testified he "couldn't see anything" because he had sweat in his eyes.  He could only "see where [the victim's] figure was." [Mulkey] did not know whether the victim was carrying a firearm but [Mulkey] did not see one.  There was, however, "something silver" in the victim's hand that "reflected from the sun."

The victim walked up to [Mulkey] as [Mulkey] descended a hill.  Later during direct examination, [Mulkey] testified that he could see the victim's eyes and the victim looked "really mad, really angry."  [Mulkey] further observed that the victim's eyes were "really black and dilated."  [Mulkey] "knew he'd been doing crank."

Standing right in front of [Mulkey's], the victim said "I'm sick and tired of you and your God damn dogs, and I'm going to kill all your dogs and you too."  The victim swung at [Mulkey] with an object in his right hand.  [Mulkey] testified that he did not know what the object was.  He did not know whether it was a knife or a gun.  [Mulkey] moved back, holding his right hand up.  The victim made contact about four or five inches above [Mulkey's] right wrist, leaving a mark that Sergeant Million later pointed out to [Mulkey].  Then the victim came back around with his left hand and slapped [Mulkey] on the top of his head and grabbed [Mulkey's] rifle.  [Mulkey] pulled back on the rifle.  [Mulkey's] hand came back on the hammer as he fell backward onto his elbows and the gun went off as he hit the ground.  When asked whether the gun fires without pulling the trigger, [Mulkey] explained that he "think[s] if the hammer goes down" on his rifle then "the gun goes off."  When the victim grabbed the gun and [Mulkey] pulled back on it, [Mulkey's] "hand slipped down the rifle." Defendant explained that "[i]t's possible when your hand is sliding down the rifle for the hammer to get depressed and for the firing mechanism just to be released." Had the gun not fired, defendant believed the victim was going to kill him.

[Mulkey] testified that he was "[p]ositive" the victim remained standing after the first shot was fired.  The sun was still behind the victim and [Mulkey] could see the victim's silhouette.  There was gravel under [Mulkey's] feet and [Mulkey] fell down onto

his elbows again.  [Mulkey] testified that "the gun went off again"—"that's when the second shot evidently went off."  The direct examination concluded as follows:

> "[DEFENSE COUNSEL]: Do you remember if you cocked the gun the second time, and it's a yes or nor or I don't know.
>
> "[MULKEY]: The lever—well, you can look at the gun.  The lever goes down pretty easy.  And when my hand got on it I was falling, so it was kind of flopping around a little bit.
>
> "[DEFENSE COUNSEL]: Do you think you may have cocked the gun a second time?
>
> "[MULKEY]: Well, it got cocked for sure.  I closed it.  That's when it went off is when I brought the lever up.  That's when it went off.
>
> "[DEFENSE COUNSEL]: Do you even remember seeing [the victim] at that point?
>
> "[MULKEY]: I didn't see him at that moment.
>
> "[DEFENSE COUNSEL]: Was it around the time frame that—did that happen instantly at the time you saw a silhouette in the sun standing there?
>
> "[MULKEY]: Yeah.  It was fast.  Everything was like a wreck on the freeway.  It was—that was it.
>
> "[DEFENSE COUNSEL]: So you don't know which direction he was facing when the second shot went off?
>
> "[MULKEY]: No.  I couldn't tell.  Sun was behind him.
>
> "[DEFENSE COUNSEL]: Okay.
>
> "[MULKEY]: I didn't know.
>
> "[DEFENSE COUNSEL]: Okay.  Did you intend to shoot [the victim]?
>
> "[MULKEY]: I never had the intention to shoot [the victim].
>
> "[DEFENSE COUNSEL]: Ever?
>
>
> "[DEFENDANT]: Ever.

After the shooting, [Mulkey] tried to keep his dogs away from the body. [Mulkey] attempted to move the body, finding a 12–inch crescent wrench in the process. [Mulkey] believed he put the crescent wrench in the victim's truck.  [Mulkey] tried to put the victim's body in the victim's truck without success.  [Mulkey] sat in the victim's truck but he testified that he was "absolutely positive" he did not drive the victim's truck. After [Mulkey] was unable to get the body inside the truck, [Mulkey] put the body inside a wheelbarrow.  During the shooting and afterward, [Mulkey's] wife remained in the cabin.

After the shooting, people arrived at [Mulkey's] property.  They acted "kind of rowdy, insistent."  "[O]ne lady was ramming [Mulkey] with her body like a football player."  "She c[a]me roaring up in a real attitude . . . . "  [Mulkey] kept telling them they were trespassing and to leave.  [Mulkey] felt threatened, so he picked up a shotgun that someone had left at his property in exchange for a $40 loan.  [Mulkey] emptied the shotgun in front of the people because he did not want anybody else to get hurt. [Mulkey] never pointed the shotgun at them, but thinks he was "waving" it and telling them to get out of there, which they eventually did.

[Mulkey] has had memory problems which, according to him, are exacerbated by trauma or stressful situations.  Around 13 years preceding his testimony, [Mulkey] suffered from "toxic shock poising" caused by medication, including Depakote, which [Mulkey] believes has ruined his life.

[Mulkey] testified that he did not remember being taken to the Brownsville Sheriff's substation or the initial interview that took place there.  Consequently, he had no idea what he had said to the interviewer or if he had even talked to one.  He did remember, however, waking up one morning, remembering that he had put the victim's body under a tarp to keep the dogs away from the body, and realizing that he needed to speak to an investigator about that.  He denied ever lying to any law enforcement officers. As an explanation for why he remembered some things at later times, [Mulkey] testified, "The significance of certain things don't occur to me whenever I am in shock and trauma like that.  I was chasing dogs, and I realize[d] I couldn't catch 14 dogs.  And I had to move the body. I couldn't take care of the dogs, and then I collapsed on one of the cedar planks I had cut."

On cross-examination, [Mulkey] testified that he did not remember whether he ever told any law enforcement officer that the victim threatened to kill him or that the victim had struck him with a silver object, even though those things would have been important.  He did not remember whether he told Sergeant Million about the crescent wrench he found and placed in the victim's truck.  [Mulkey] was asked "You killed Keith Hendricks?" and [Mulkey] responded, "That's quite evident. I never denied it."  He claimed to have no memory of denying that he killed the victim, although he does not think he did.  And he was "[a]bsolutely certain" he did not drive the victim's truck off of his property.

At the end of [Mulkey's] testimony, the court posed the following questions to [Mulkey]:

"THE COURT: ... Did you intend to shoot [the victim]?

"[MULKEY]: By no means. No, sir.

"THE COURT: Did you intend for the rifle to be fired?

"[MULKEY]: No, sir.

"THE COURT: Are you saying that the discharge of the rifle was accidental?

"[MULKEY]: Basically. Yes, sir.

"THE COURT: 'Basically.' What does that mean?

"[MULKEY]: For sure.  That's basic."

### C. Prosecution's Rebuttal Evidence

**1. Toxicology evidence**
No methamphetamine or amphetamine was found in the victim's system.

**2. [Mulkey's] statements**
[Mulkey] never told Sergeant Million that the victim threatened to kill [Mulkey's] dogs and [Mulkey] that evening.  A statement of that magnitude would have been noted if made to other officers and then passed along to Sergeant Million.  [Mulkey] also never told Million that the victim had slapped him on the head or that the victim had grabbed the rifle during the encounter.  During Sergeant Million's June 24 interview, [Mulkey] indicated that before firing the second shot, [Mulkey] did a "trick" manipulation of the lever action at hip level before the shot was fired.

**3. The rifle**
Sergeant Million elaborated on the operation of the rifle and demonstrated how it works to the jury.

"[PROSECUTOR]: Let's assume that you've got several rounds in the magazine and one in the chamber.  You've got the gun in the configuration it's in right now.  What do you have to do to fire this gun at this point?

"[MILLION]: In order to fire this weapon you have to cock the hammer, which you take it and you have to pull the hammer all the way back . . . two clicks [.]  The first click was a half cock, a safety mechanism.  The second click is where it's in a firing position.  In order to do it, I'm going to go ahead and drop the hammer. You have to pull the trigger here and it fires forward.  Once it does that, it releases it.  And in order to reload it, you have to take and move the mechanism

back, move it all the way forward.  Has to go all the way forward to such in order to have a shell to come up.  You can see in here there is a slide when this magazine drops.  Allows the shell, which pretty much takes up the majority of the loading port.  And then in order to load it again, you have to forward this forward [sic ] again like I did before.  Pushes the bolt, grabs the base of the shell.  The ejectors grab it, slide it forward.  And it clicks forward, and you have to have it clicked forward in order to fire.

"[PROSECUTOR]: And it's immediately available to fire once you do that?

"[MILLION]: It's cocked, and you have to fire it again.  If you are going to fire it, you have to pull the trigger again.  You can see it actually fires again.  If it was back, in order to put it back to safe you actually have to disengage the hammer, let it go all the way forward with your thumb controlling it so it doesn't discharge.  And you have to pull it back to the half cock and . . . it's in half cock safety, should not be able to fire.  And it cannot."[FN3]

FN3.   It may be that the combination of the oral description and visual demonstration made Million's description of the rifle's cycle of operation clear to the jury.  We do not have the benefit of the visual demonstration, but infer from Million's testimony in the prosecution's case-in-chief and the quoted testimony in the prosecution's rebuttal case that in order to fire a shot after a shot is fired, one has to work the lever action to rechamber a round, pull the hammer back two clicks, and then pull the trigger.

**D. Jury Instructions and Verdict**

Among other instructions, the court instructed the jury on accident, self-defense, two forms of second degree murder, and voluntary manslaughter.  Despite [Mulkey's] request, the court did not instruct the jury on involuntary manslaughter.  The jury found [Mulkey] guilty of second degree murder, and found true the firearm allegation.  The jury found [Mulkey] not guilty of assault with a firearm on Cavagnaro, Maudlin, and Hawkins.

**E. New Trial Motion and Sentencing**

[Mulkey] filed a new trial motion in which he contended the trial court erred in failing to instruct on involuntary manslaughter as requested by the defense at trial.

At the hearing on the motion, before defense counsel tendered oral argument, defendant himself verbally addressed the court.  [Mulkey] referenced "*Marsden*"[FN4] and stated that he wanted a new trial, complaining that his "disabled" and "distracted" condition had prevented the "truth" from coming forward.  The trial court explained to [Mulkey] that his counsel's motion for a new trial would be heard that morning and that a *Marsden* motion was not an appropriate motion because his counsel was retained, not appointed.

FN4.   *People v. Marsden* (1970) 2 Cal. 3d 118 (*Marsden*).

Thereafter, the trial court heard argument on the new trial motion and denied it.  The trial court sentenced [Mulkey] to a state prison term of 15 years to life for the second degree murder and a consecutive state prison term of 25 years to life for the firearm enhancement.

*People v. Mulkey*, No. C063519, 2012 WL 3291868, at *1-10 (Cal. Ct. App. Aug. 14, 2012).

Through counsel, Mulkey appealed his conviction, arguing that the trial court made the following errors: 1) refused to instruct the jury on involuntary manslaughter; 2) misinstructed the jury on unreasonable self-defense; 3) improperly instructed the jury with CALJIC No. 2.21.2; and 4) erroneously denied Mulkey's request to discharge his retained counsel.  Mulkey additionally argued that the cumulative effect of the instructional errors warranted reversal of the judgment.  The Court of Appeal unanimously affirmed the judgment against Mulkey in an unpublished, reasoned decision issued on August 14, 2012.  *Mulkey*, 2012 WL 3291868, at *24.  Mulkey petitioned for review in the California Supreme Court, which was denied without comment on November 14, 2012.  Mulkey's conviction became final on direct review 90 days later, when his time to file a petition for *certiorari* in the Supreme Court expired on February 14, 2013.  *See Jiminez v. Quarterman*, 555 U.S. 113, 119 (2009); *Spitsyn v. Moore*, 345 F.3d 796, 798 (9th Cir. 2003).

Mulkey timely filed a *pro se* petition to this Court on February 4, 2014. *See* 28 U.S.C.
§ 2244(d)(1)(A).

## II. GROUNDS RAISED

In his *pro se* Petition before this Court, Mulkey raises the same arguments he
unsuccessfully raised to the state courts on direct appeal, namely that: 1) the trial court erred in
refusing to instruct the jury on the lesser included offense of involuntary manslaughter; 2) the
court erred in its instructions on unreasonable self defense; 3) the court improperly gave the
CALJIC No. 2.21.2 instruction; 4) the court erred in denying Mulkey's motion to discharge his
retained counsel; and 5) the cumulative effect of the instructional errors warrants reversal of his
conviction.

## III. STANDARD OF REVIEW

Under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), 28 U.S.C.
§ 2254(d), this Court cannot grant relief unless the decision of the state court was "contrary to, or
involved an unreasonable application of, clearly established Federal law, as determined by the
Supreme Court of the United States," § 2254(d)(1), or "was based on an unreasonable
determination of the facts in light of the evidence presented in the State court proceeding,"
§ 2254(d)(2). A state-court decision is contrary to federal law if the state court applies a rule that
contradicts controlling Supreme Court authority or "if the state court confronts a set of facts that
are materially indistinguishable from a decision" of the Supreme Court, but nevertheless arrives
at a different result. *Williams v. Taylor*, 529 U.S. 362, 406 (2000).

The Supreme Court has explained that "clearly established Federal law" in § 2254(d)(1)
"refers to the holdings, as opposed to the dicta, of [the Supreme Court] as of the time of the

relevant state-court decision." *Id.* at 412.  The holding must also be intended to be binding upon

the states; that is, the decision must be based upon constitutional grounds, not on the supervisory

power of the Supreme Court over federal courts.  *Early v. Packer*, 537 U.S. 3, 10 (2002).  Where

holdings of the Supreme Court regarding the issue presented on habeas review are lacking, "it

cannot be said that the state court 'unreasonabl[y] appli[ed] clearly established Federal law.'"

*Carey v. Musladin*, 549 U.S. 70, 77 (2006) (citation omitted).

 To the extent that the Petition raises issues of the proper application of state law, they are

beyond the purview of this Court in a federal habeas proceeding.  *See Swarthout v. Cooke*, 131 S.

Ct. 859, 863 (2011) (per curiam) (holding that it is of no federal concern whether state law was

correctly applied).  It is a fundamental precept of dual federalism that the states possess primary

authority for defining and enforcing the criminal law.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62,

67-68 (1991) (a federal habeas court cannot reexamine a state court's interpretation and

application of state law); *Walton v. Arizona,* 497 U.S. 639, 653 (1990) (presuming that the state

court knew and correctly applied state law), *overruled on other grounds by Ring v. Arizona*, 536

U.S. 584 (2002).

 In applying these standards on habeas review, this Court reviews the "last reasoned

decision" by the state court.  *See Robinson v. Ignacio,* 360 F.3d 1044, 1055 (9th Cir. 2004)

(citing *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002)).  A summary denial is an adjudication

on the merits and entitled to deference.  *Harrington v. Richter*, 562 U.S. 86, 99 (2011).  Under

the AEDPA, the state court's findings of fact are presumed to be correct unless the petitioner

rebuts this presumption by clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *Miller-El v.

Cockrell*, 537 U.S. 322, 340 (2003).

Mulkey has not replied to Respondent's answer.  The relevant statute provides that "[t]he allegations of a return to the writ of habeas corpus or of an answer to an order to show cause in a habeas corpus proceeding, if not traversed, shall be accepted as true except to the extent that the judge finds from the evidence that they are not true."  28 U.S.C. § 2248; *see also Carlson v. Landon*, 342 U.S. 524, 530 (1952).  Where, as here, there is no traverse filed and no evidence offered to contradict the allegations of the return, the court must accept those allegations as true. *See Phillips v. Pitchess*, 451 F.2d 913, 919 (9th Cir. 1971).

IV. DISCUSSION

A.    <u>Instructional Errors (Grounds 1, 2, 3, 5)</u>

Mulkey first argues that the trial court made a number of errors with respect to the instructions to the jury.  Because jury instructions in state trial are typically matters of state law, federal courts are bound by a state appellate court's determination that a jury instruction was not warranted under state law.  *See Bradshaw*, 546 U.S. at 76 (2005) (noting that the Supreme Court has repeatedly held that "a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."); *see also Williams v. Calderon*, 52 F.3d 1465, 1480-81 (9th Cir. 1995).  An instructional error, therefore, "does not alone raise a ground cognizable in a federal habeas proceeding." *Dunckhurst v. Deeds*, 859 F.2d 110, 114 (9th Cir. 1986) (citation omitted).

A challenged instruction violates the federal constitution if there is a "reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence."  *Boyde v. California*, 494 U.S. 370, 380 (1990).  The question is whether the instruction, when read in the context of the jury charges as a

whole, is sufficiently erroneous to violate the Fourteenth Amendment. *Francis v. Franklin*, 471

U.S. 307, 309 (1985).  This Court must also assume in the absence of evidence to the contrary

that the jury followed those instructions. *Weeks v. Angelone*, 528 U.S. 225, 234 (2000);

*Richardson v. Marsh*, 481 U.S. 200, 206 (1987) (noting the "almost invariable assumption of the

law that jurors follow their instructions"); *see Francis*, 471 U.S. at 323-24 & n.9 (discussing the

subject in depth).

It is well-established that not only must the challenged instruction be erroneous but it

must violate some constitutional right, and it may not be judged in artificial isolation but must be

considered in the context of the instructions as a whole and the trial record. *Estelle*, 502 U.S. at

72.  This Court must also bear in mind that the Supreme Court has admonished that the inquiry is

whether there is a reasonable likelihood that the jury applied the challenged instruction in a way

that violates the constitution and that the category of infractions that violate "fundamental

fairness" is very narrowly drawn. *Id.* at 72-73.  "Beyond the specific guarantees enumerated in

the Bill of Rights, the Due Process clause has limited operation." *Id.*   Where the defect is the

failure to give an instruction, the burden is even heavier because an omitted or incomplete

instruction is less likely to be prejudicial than an instruction that misstates the law. *See*

*Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  In those cases, the inquiry is whether the trial

court's refusal to give the requested instruction "so infected the entire trial that the resulting

conviction violates due process." *See id.* at 156-57; *Estelle*, 502 U.S. at 72.  Moreover, even if

the trial court's failure to give the instruction violated due process, habeas relief would still not

be available unless the error had a "substantial and injurious effect or influence in determining

the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993); *California v. Roy*, 519

U.S. 2, 5 (1996).

       1.    *Involuntary manslaughter instruction*

      Mulkey contends that the trial court committed reversed error when it refused his request

to instruct on involuntary manslaughter as a lesser included offense to murder.  At trial, the court

instructed the jury on the definition of murder and two theories of second degree murder: murder

with express malice and murder with implied malice.  The court also instructed on voluntary

manslaughter, grounded on heat of passion and imperfect self-defense.

      Mulkey further requested that an involuntary manslaughter instruction be given.  As the

Court of Appeal explained, "[i]nvoluntary manslaughter is the unlawful killing of a human being

during (1) the commission of an ordinarily lawful act done without due caution and

circumspection or (2) the commission of a misdemeanor or a noninherently dangerous felony

which is dangerous to human life under the circumstances of its commission."  *Mulkey*, 2012

WL 3291868, at *12 (citing Cal. Penal Code § 192(b)).  Mulkey argued on appeal that:

> the jury could have found the first shot was accidental and "they *could easily have* found either shot was discharged in a grossly negligent manner, particularly based on the evidence one had to manipulate the lever and/or the hammer to fire the rifle."  (Italics added.)  Further, [Mulkey] argue[d], "[b]ased on the same evidence the firearm required manipulation to fire, they *could* also have found misdemeanor brandishing . . . ."  (Italics added.)  Or the jury "*could* likewise readily find excessive (and grossly negligent) force in reasonable self-defense [citation] or a shooting short of conscious disregard of life in unreasonable self-defense" because the jury could have found that the shooting occurred during the commission of the misdemeanor of brandishing a firearm and that the gun discharged accidentally.

*Id.*

      As an initial matter, the United States Supreme Court has held that the failure to instruct

on a lesser included offense in a capital case is constitutional error if there was evidence to

support the instruction. *Beck v. Alabama*, 447 U.S. 625, 638 (1980).  The Supreme Court, however, has not decided whether to extend this rationale to non-capital cases.  The Ninth Circuit, like several other federal circuits, has declined to extend *Beck* to find constitutional error arising from the failure to instruct on a lesser included offense in a non-capital case.  *See Solis v. Garcia*, 219 F.3d 922, 929 (9th Cir. 2000); *Windham v. Merkle*, 163 F.3d 1092, 1106 (9th Cir. 1998) ("[T]he failure of a state trial court to instruct on lesser included offenses in a non-capital case does not present a federal constitutional question."); *James v. Reese*, 546 F.2d 325, 327 (9th Cir. 1976) ("Failure of a state court to instruct on a lesser offense fails to present a federal constitutional question and will not be considered in a federal habeas corpus proceeding.").  Accordingly, the decisions of the California courts denying Mulkey relief as to this claim are not contrary to United States Supreme Court authority as set forth in *Beck*.

Nevertheless, the Ninth Circuit has stated that "the refusal by a court to instruct a jury on lesser included offenses, when those offenses are consistent with defendant's theory of the case, may constitute a cognizable habeas claim" under clearly established United States Supreme Court precedent.  *Solis*, 219 F.3d at 929.  But as the Court of Appeal reasonably determined, any purported error in not giving the involuntary manslaughter instruction was harmless because there was no substantial or injurious influence on the jury's verdict.

As previously mentioned, a claim of jury instruction error is also reviewed under a harmless error standard on federal habeas review.  *Evanchyk v. Stewart*, 340 F.3d 933, 940-41 (9th Cir. 2003).  In accordance with this review, habeas relief is only available where the error had a "substantial and injurious effect or influence in determining the jury's verdict" and resulted in "actual prejudice."  *Brecht*, 507 U.S. at 637; *Hedgpeth v. Pulido*, 555 U.S. 57, 61-62 (2008).

-19-

The relevant question is "whether the instructions as a whole are misleading or inadequate to guide the jury's deliberation." *United States v. Elofus*, 598 F.3d 1171, 1174 (9th Cir. 2010). The Supreme Court recently clarified that *Brecht* incorporates the requirements of § 2254(d) (AEDPA). *See Davis v. Ayala*, 135 S. Ct. 2187, 2199 (2015). Thus, if a state court has determined that a trial error was harmless, "a federal court may not award habeas relief under § 2254(d) unless *the harmlessness determination itself* was unreasonable." *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119 (2007)) (emphasis in original).

On independent review, the Court likewise concludes that any instructional error was harmless. In light of the record of evidence, there is no reasonable basis for assuming that, had the jury been instructed on the involuntary manslaughter theory, the verdict would have been any different, particularly given that the jury, in finding true the allegation that Mulkey personally and intentionally discharged a firearm, clearly rejected any notion that Mulkey discharged his rifle unintentionally. *See Brecht*, 507 U.S. at 623. As the Court of Appeal found, "Based on the evidence that the victim was shot twice, including once in the back, the evidence concerning the operation of the 30/30 lever-action rifle, and [Mulkey's] story of how the shooting occurred, which evolved, from his initial denials to his claim that the victim threatened to kill him and his dogs and then swung at him with a wrench, the jury was not reasonably likely to have convicted defendant of involuntary manslaughter had instructions for that lesser offense been given under any theory." *Mulkey*, 2012 WL 3291868, at *15. It is thus clear that the failure to instruct in this regard could not have had any adverse effect whatsoever on the jury's decision, much less the

"substantial and injurious effect" required to show the error was harmful.[2]  *Brecht*, 507 U.S. at

637.  Accordingly, the Court concludes that no habeas relief is warranted on this ground.

2.    *Imperfect self defense instruction*

Mulkey likewise claims that the instructions on unreasonable self-defense were erroneous

in two ways.  First, although he acknowledges that the trial court properly instructed the jury that

it could consider antecedent threats on the question of self-defense, Mulkey argued on appeal

that the trial court erred because "no instruction was given allowing jurors to consider antecedent

threats on the question of imperfect self-defense voluntary manslaughter."  Second, Mulkey

alleges that the trial court erred in failing to define the term "wrongful conduct" in CALJIC No.

5.17.

The Court of Appeal considered and rejected his first argument as follows:

> Here, the jury received instructions on self-defense and imperfect self-defense.
> Using CALJIC No. 5.50.1, the trial court instructed the jury on antecedent threats:
> "Evidence has been presented that on a prior occasion the alleged victim threatened the
> defendant.  If you find that this evidence is true, you may consider that evidence on the
> issues of whether the defendant *actually* and reasonably believed his life or physical
> safety was endangered at the time of the commission of the alleged crime.  [¶]  In
> addition, a person whose life or safety has been previously threatened, or assaulted by
> another is justified in acting more quickly and taking harsher measures for self protection
> from assault by that person than would a person who had not received threats from or
> previously been assaulted by the same person."  (Italics added.)

---

[2]      Other courts have admonished that harmless error review should not be confused
with the sufficiency of the evidence inquiry required under *Jackson v. Virginia*, 443 U.S. 307,
324 (1979).  *See, e.g.*, *Jensen v. Clements*, 800 F.3d 892, 902 (7th Cir. Sept. 8, 2015) ("Time and
time again, the Supreme Court has emphasized that a harmless-error inquiry is not the same as a
review for whether there was sufficient evidence at trial to support a verdict.").  The Court's
reliance on the overwhelming evidence against Mulkey in finding that any error was harmless
does not simply focus on the sufficiency of the other evidence, but rather properly "look[s] at the
influence the improperly admitted [evidence] had on the verdict," in light of a "host of factors,"
including the overall strength of the prosecution's case.  *Id.* at 904 (citations omitted).

Nothing in the language of CALJIC No. 5.50.1 indicates it is applicable only to complete self-defense.  While reminding the jury that there was evidence that the victim previously threatened [Mulkey], the instruction further stated that if the jury found the evidence to be true, the jury could then "consider that evidence on the *issues* of whether the defendant *actually* and reasonably believed his life or physical safety was endangered."  (Italics added.)  Contrary to [Mulkey's] claim, the instruction did not limit the jury's consideration of prior threats solely to the issue of complete self-defense. Rather, the instruction told the jury it should consider such evidence in deciding the "issues" of whether [Mulkey's] belief was both actual and reasonable.  Thus, the instruction told the jury to consider the prior threats when deciding whether [Mulkey] actually believed he needed to defend himself—the mens rea predicate to negating malice by imperfect self-defense.  The jury was instructed to "[c]onsider the instructions as a whole and each in light of all the others," so the jury was required to consider CALJIC No. 5.50.1 in connection with the imperfect self-defense instruction.  Finally, in his closing argument, defense counsel mentioned the prior threats evidence and shortly thereafter discussed the concept of imperfect self-defense without any suggestion that the prior threats could not be considered on this topic.

*Mulkey*, 2012 WL 3291868, at *19.

It likewise rejected his second argument:

Looking at the larger context, the instruction informed the jury that the "unlawful or wrongful" conduct subject to consideration is that which "created the circumstances which legally justified his adversary's use of force or attack."  And the trial court gave several other instructions which explained when force or attack by anyone is legally justified.  In addition to instructing on justifiable homicide in self-defense (CALJIC No. 5.12), the court instructed the jury with CALJIC No. 5.50: ". . . In the exercise of his right of self-defense a person may stand his ground and defend himself by the use of all force and means which would appear to be necessary to a reasonable person in a similar situation and with similar knowledge; and a person may pursue his assailant until he has secured himself from danger if that course likewise appears reasonably necessary.  This law applies even though the assailed person might more easily have gained safety by flight or by withdrawing from the scene."  The court further instructed with CALJIC No. 5.51: "Actual danger is not necessary to justify self-defense.  If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an actual belief and fear that he is about to suffer bodily injury, and if a reasonable person in a like situation, seeing and knowing the same facts, would be justified in believing himself in like danger, and if that individual so confronted acts in self-defense upon those appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent."  Further, the jury was informed with CALJIC No. 5.52 that "right of self-defense exists only so long as the real or apparent threatened danger continues to exist.  When the danger ceases to appear to exist, the right to use force in self-defense ends."  Finally, in the context of defining "assault," the jury

was informed that "a willful application of physical force upon the person of another is not unlawful when done in lawful self-defense."

Thus, taken together, the numerous other instructions sufficiently explained to the jury the circumstances under which [Mulkey's] adversary's (i.e., the victim's) use of force would be legally justified, dispelling any fear that the jury would liberally apply the term "wrongful conduct" to include foolish conduct, or any other behavior, that fell short of justifying the victim's use of force.

Id. at * 20-21.

The California Court of Appeal's conclusions are both reasonable and fully supported by the record. For the reasons persuasively explained by the Court of Appeal, there simply is no basis to conclude that the jury believed that prior threats evidence could only be considered on the issue of reasonable self-defense or that the jury misapplied the term "wrongful conduct" to improperly restrict the applicability of imperfect self-defense. Mulkey is therefore not entitled to relief on his claim relating to the imperfect self-defense instructions.

3.      *CALJIC 2.21.2*

Mulkey also alleges that the trial court erred in instructing the jury with CALJIC No. 2.21.2,[3] which he contends improperly lessened the prosecution's burden of proof. But this claim is foreclosed by *People v. Maury*, 68 P.3d 1, 63-64 (Cal. 2003), and *Turner v. Calderon*, 281 F.3d 851, 865-66 (9th Cir. 2002), in which the California Supreme Court and the Ninth Circuit each determined that CALJIC No. 2.21.2 does not reduce the prosecutor's burden of

---

[3]      That section provides:

A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all of the evidence, you believe the probability of truth favors his other testimony in other particulars.

CALJIC No. 2.21.2.

proof.  It cannot be said that the decision of the Court of Appeal rejecting Mulkey's claim

contravenes or unreasonably applies controlling United States Supreme Court authority, and

Mulkey's claim must fail.

    4.    *Cumulative error*

    Mulkey further claims that the cumulative effect of the above instructional errors

warrants relief.  "While the combined effect of multiple errors may violate due process even

when no single error amounts to a constitutional violation or requires reversal, habeas relief is

warranted only where the errors infect a trial with unfairness."  *Peyton v. Cullen*, 658 F.3d 890,

896-97 (9th Cir. 2011) (citing *Chambers v. Mississippi*, 401 U.S. 284, 298, 302-03 (1973)).

Such "infection" occurs where the combined effect of the errors had a "substantial and injurious

effect or influence  in determining the jury's verdict."  *Brecht*, 507 U.S. at 623 (citation omitted).

In other words, where the combined effect of individually harmless errors renders a criminal

defense "far less persuasive than it might [otherwise] have been," the resulting conviction

violates due process.  *See Chambers*, 401 U.S. at 294.  As discussed above, however, Mulkey

does not allege any claims that amount to error, and thus he demonstrates no errors that can

accumulate to a level of a constitutional violation.  *See Mancuso v. Olivarez*, 292 F.3d 939, 957

(9th Cir. 2002).  Accordingly, Mulkey is not entitled to relief on his cumulative error claim

either.

B.    <u>Discharge of Retained Counsel (Ground 4)</u>

    Mulkey additionally contends that the trial court refused to permit him to discharge his

retained attorney at the hearing on his new trial motion.  The Court of Appeal described the

following facts underlying this claim:

-24-

"THE COURT: [Mulkey] is present with counsel.  District Attorney is represented by both trial counsel.  And is Defense ready to proceed?  First, on the motion for new trial.

"[DEFENSE COUNSEL]: Well, Your Honor, first, [Mulkey], although I talked to him, he does want—he did want to—he has some kind of *Marsden* motion that he wanted to address to the Court.

"THE COURT: Were you appointed or retained?

"[DEFENSE COUNSEL]: I am retained.

"THE COURT: *Marsden* motions don't apply to retained counsel.

"[MULKEY]: Well, Your Honor, according to this *Marsden* motion, I was able to obtain—

"THE COURT: Mr. Mulkey, *Marsden* motions don't apply when you have hired an attorney.  They only apply when there is Court-appointed counsel.

"[MULKEY]: I'm not an attorney but I have some problem[s].  I'm a disabled man.  This is why I took the remaining money from my mother's inheritance—she died, my mother—to hire these people to represent me, and why witnesses were not called for my defense.  When the officer showed at the scene, all I could do is inform him of my condition.  That was all I was able to do.  My story has not come forward.  When I was examined in the court, I was distracted by a story of a lady I took care of from seven and a half years from telling what happened.  And the story has been confused, misrepresented. And the truth has not come forward.  I was requesting, sir, a new trial so that this could happen.

"THE COURT: There is a motion for a new trial that [the] Court will be considering this morning.

"[MULKEY]: Thank you, sir. I have not understood everything.  Our communication has been very limited.  And I—just as I told one judge, I've been postponed and postponed for a year and a half.  And I didn't want to be postponed the first time.  I tried to tell the story to the investigator shortly after arrest.  I was not able to that night because of my condition.  And I only wanted the truth to come forward.  I am now at a loss because of my condition.  But I thank Your Honor for hearing me.

"THE COURT: Okay, as I indicated, since counsel was retained, the *Marsden* motion—a *Marsden* motion is not an appropriate motion to bring.  Therefore, the court is prepared to go forward on the motion for new trial, which I have reviewed."

*Mulkey*, 2012 WL 3291868, at *21-22.

Mulkey contends, as he did on direct appeal, that the exchange amounted to a denied request to discharge his retained counsel.  The Court of Appeal disagreed, stating that "[t]here must be a much more clear expression of intent to discharge than what is presented here."  *Id.* at *23.

The Sixth Amendment right to counsel encompasses two distinct rights: a right to adequate representation and a right to choose one's own counsel.  *United States v. Rivera-Corona*, 618 F.3d 976, 979 (9th Cir. 2010).  The adequate-representation right applies to all defendants and "focuses on the adversarial process, not on the accused's relationship with his lawyer as such."  *United States v. Cronic*, 466 U.S. 648, 657 n.21 (1984).  A defendant who can hire his own attorney has a different right, independent and distinct from the right to effective counsel, to be represented by the attorney of his choice.  *See Rivera-Corona*, 618 F.3d at 979 (citing *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006)) (emphasis omitted).  However, the right to retained counsel of one's choice is not absolute.  The Supreme Court has "recognized a trial court's wide latitude in balancing the right to counsel of choice against the needs of fairness . . . and against the demands of its calendar."  *Gonzalez-Lopez*, 548 U.S. at 152 (citing *Wheat v. United States*, 486 U.S. 153, 159-60 (1988)).  As such, trial courts retain the discretion to "make scheduling and other decisions that effectively exclude a defendant's first choice of counsel."  *Id.*  In general, a defendant who can afford to hire counsel may have the counsel of his choice unless "the substitution would cause significant delay or inefficiency."  *Rivera-Corona*, 618 F.3d at 979; *see also United States v. Ensign*, 491 F.3d 1109, 1115 (9th Cir. 2007).

Here, the issue is whether Mulkey even invoked his right to discharge his retained

counsel.  After independently reviewing the record, the Court likewise concludes that the

statements Mulkey made did not amount to a request or motion to discharge his retained counsel.

As the Court of Appeal correctly noted:

> Looking at the undisputed comments from [Mulkey], we see nothing in the record that is a clear expression of an intent to discharge his retained counsel.  True, defense counsel indicated that [Mulkey] had "some kind" of *Marsden* motion that he wanted to discuss, and [Mulkey] himself indicated he was able to obtain a "*Marsden*" motion, which could possibly signal that [Mulkey] wanted another attorney.  When [Mulkey] spoke further, however, his true concern was revealed.
>
> [Mulkey's] focus was not discharging his attorney, but the desire for a do-over in order to better tell his story so that his idea of the "truth" could "come forward."  After he was informed the court was prepared to hear the new trial motion, [Mulkey] thanked the court.
>
> Not once did [Mulkey] state that he wanted to hire another attorney.  Nor did he state he wanted the court to appoint a new attorney.  Nor did he state he no longer wanted his current attorney to represent him in the new trial motion or for any other purpose related to the case.  [Mulkey] simply expressed that he wanted another trial.
>
> [Mulkey] repeatedly and squarely blamed his "condition" for preventing the truth from coming forward, and he clearly stated he was "at a loss because of [his] condition" (but not because of his counsel).  [Mulkey] also claimed that during trial, when he testified, he was distracted "by a story of a lady" he took care of in the past.  This distraction had nothing to do with his counsel's trial performance.
>
> The only apparent criticism [Mulkey] levied against his attorney was limited communication, some undesired postponements, and a fragmented ambiguous statement about not calling unidentified witnesses ("and why witnesses were not called for my defense").  But again, despite these criticisms, [Mulkey] never once stated he wanted a different attorney, and these criticisms can be made just as easily by a [Mulkey] who wishes to maintain his retained counsel as someone who desires new representation.

*Mulkey*, 2012 WL 3291868, at *24.

Notably, "[i]t is well established and clear that the Sixth Amendment requires on the

record an appropriate inquiry into the grounds for [a substitution of attorney motion], and that

the matter be resolved on the merits before the case goes forward."  *Schell v. Witek*, 218 F.3d

1017, 1025 (9th Cir. 2000) (en banc) (remanding for evidentiary hearing where state court had

failed to make any inquiry into the substance of defendant's claims alleging breakdown of attorney-petitioner relationship, so there was no record of how far that relationship had deteriorated).  Had Mulkey expressed a belief that counsel was ineffective, however inartfully stated, it would have been proper for the trial court to inquire further, and possibly address whether Mulkey's Sixth Amendment rights were adequately protected.  Here, however, the state court, in denying Mulkey's Sixth Amendment claim, reasonably construed his statements as a request for a do-over rather than an attempt to move to discharge counsel.  Mulkey cites to no Supreme Court authority, and this Court is not aware of any, requiring a state trial court to conduct further inquiry in such circumstances.  Mulkey thus fails to demonstrate that the state court rejection of his claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d), and federal habeas relief is not warranted on this claim.

## V. CONCLUSION AND ORDER

Mulkey is not entitled to relief on any ground raised in his Petition.

**IT IS THEREFORE ORDERED THAT** the Petition under 28 U.S.C. § 2254 for Writ of Habeas Corpus is **DENIED**.

**IT IS FURTHER ORDERED THAT** the Court declines to issue a Certificate of Appealability.  *See* 28 U.S.C. § 2253(c); *Banks v. Dretke*, 540 U.S. 668, 705 (2004) ("To obtain a certificate of appealability, a prisoner must 'demonstrat[e] that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" (quoting *Miller-El*,

537 U.S. at 327)).  Any further request for a Certificate of Appealability must be addressed to the

Ninth Circuit Court of Appeals.  *See* FED. R. APP. P. 22(b); 9TH CIR. R. 22-1.

The Clerk of the Court is to enter judgment accordingly.

Dated: August 26, 2016.

/s/James K. Singleton, Jr.
JAMES K. SINGLETON, JR.
Senior United States District Judge